RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 17a0237p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

IN RE: ALVA E. CAMPBELL, JR.,

*Movant.*

No. 17-3855

On Motion to Remand.

On Motion to Authorize the Filing of a Second or
Successive Application for Habeas Corpus Relief.

United States District Court for the Southern District of Ohio at Columbus.
No. 2:15-cv-01702—Walter H. Rice, District Judge.

Decided and Filed:  October 25, 2017

Before:  MOORE, GIBBONS, and McKEAGUE, Circuit Judges.

_____

**COUNSEL**

**ON MOTION:**  David C. Stebbins, FEDERAL PUBLIC DEFENDER, Columbus, Ohio, for Movant.  **ON RESPONSE:**  Stephen E. Maher, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Respondent.

The court delivered a PER CURIAM opinion.  MOORE, J. (pp. 15–18), delivered a separate dissenting opinion.

_____

**ORDER**

_____

PER CURIAM.  Alva Campbell, Jr., an Ohio prisoner sentenced to death, moves this court to remand this case to the district court for initial consideration of his petition for a writ of habeas corpus filed under 28 U.S.C. § 2254.  The warden has filed a response opposing his motion.  Upon review, we deny Campbell's motion.

# I

An Ohio jury convicted Campbell of four counts of aggravated murder, four counts of aggravated robbery, two counts of attempted kidnapping, and one count each of kidnapping, felonious assault, escape, and having a weapon under a disability. The jury recommended that Campbell be sentenced to death. The trial court adopted this recommendation and sentenced Campbell accordingly. On direct appeal, the Ohio Supreme Court affirmed Campbell's convictions, but the court remanded the case to the trial court for resentencing due to a procedural error. *State v. Campbell*, 738 N.E.2d 1178, 1205 (Ohio 2000). On remand, the trial court resentenced Campbell to death. The Ohio Supreme Court affirmed this sentence. *State v. Campbell*, 765 N.E.2d 334, 344 (Ohio 2002).

In 2005, Campbell filed his first § 2254 petition, alleging twelve grounds for relief. The district court dismissed his petition, and this court affirmed that decision. *Campbell v. Bradshaw*, 674 F.3d 578, 598 (6th Cir. 2012).

In 2015, Campbell filed a second § 2254 petition, this time challenging Ohio's lethal injection protocol. The magistrate judge ordered that the case be transferred to this court for initial review because Campbell was attempting to file a "successive" habeas petition, and the magistrate judge repeatedly rejected Campbell's challenges to that order. *See Campbell v. Jenkins*, No. 2:15-CV-1702, 2017 WL 1196167 (S.D. Ohio Mar. 31, 2017); *Campbell v. Jenkins*, No. 2:15-CV-1702, 2017 WL 978122 (S.D. Ohio Mar. 14, 2017). Campbell appealed this decision to the district judge, who affirmed the order and transferred Campbell's petition to us for initial consideration. *Campbell v. Jenkins*, No. 2:15-CV-1702, 2017 WL 3524686 (S.D. Ohio Aug. 16, 2017).

# II

Before a habeas petitioner can file a "second or successive" § 2254 petition, he must receive authorization from the court of appeals. 28 U.S.C. § 2244(b)(3)(A); *In re Salem*, 631 F.3d 809, 812 (6th Cir. 2011). To obtain this authorization, the petitioner must make a prima facie showing either that: (1) a new rule of constitutional law applies to his case that the Supreme Court made retroactive to cases on collateral review; or (2) a newly discovered factual

predicate exists which, if proven, sufficiently establishes that no reasonable fact-finder would have found the petitioner guilty of the underlying offense but for constitutional error. 28 U.S.C. §§ 2244(b)(2) and 2244(b)(3)(C); *Magwood v. Patterson*, 561 U.S. 320, 330 (2010). In this context, a prima facie showing means sufficient allegations of fact combined with some documentation that would warrant fuller exploration in the district court. *Keith v. Bobby*, 551 F.3d 555, 557 (6th Cir. 2009).

However, in limited situations, a § 2254 petition is not considered "second or successive" within the meaning of § 2244(b) even though the petitioner filed a previous habeas application. *See Storey v. Vasbinder*, 657 F.3d 372, 376 (6th Cir. 2011). Under § 2244(b), the phrase "second or successive" is not self-defining. *Panetti v. Quarterman*, 551 U.S. 930, 943 (2007); *Salem*, 631 F.3d at 812. Rather, it is a term of art given substance by the Supreme Court's habeas cases. *Slack v. McDaniel*, 529 U.S. 473, 486 (2000); *Salem*, 631 F.3d at 812. For example, a habeas petition is not considered "second or successive" under § 2244(b) when the claim has been raised in a prior petition, but dismissed as unripe, although other claims in the initial petition were decided on the merits. *Stewart v. Martinez-Villareal*, 523 U.S. 637, 643–46 (1998). Even if the claim was not presented in an earlier petition, a subsequent petition raising the claim does not constitute a "successive" petition for purposes of § 2244(b) if the claim would have been dismissed as unripe in the initial petition. *Panetti*, 551 U.S. at 945. Nor do the successive petition restrictions apply if the first petition was dismissed for lack of exhaustion. *Slack*, 529 U.S. at 478, 487. The restrictions also do not apply if an intervening state court judgment (such as a resentencing) occurred after the first habeas petition was decided. *Magwood*, 561 U.S. at 335, 339; *King v. Morgan*, 807 F.3d 154, 157 (6th Cir. 2015). This court reviews de novo the question of whether Campbell's current petition is "second or successive" within the meaning of § 2244(b). *See Lang v. United States*, 474 F.3d 348, 351 (6th Cir. 2007).

It is undisputed that Campbell is attempting to challenge the same state-court judgment as in his prior § 2254 petition. Thus, a federal habeas court must consult abuse-of-the-writ principles, as modified by the Anti-Terrorism and Effective Death Penalty Act (AEDPA), to determine whether Campbell's current petition is "second or successive." *See Askew v. Bradshaw*, 636 F. App'x 342, 347 (6th Cir. 2016). Under pre-AEDPA caselaw, a petitioner

abused the writ by raising a claim in a subsequent petition that could have been raised in an earlier petition, regardless of whether the failure resulted from inexcusable neglect or a deliberate choice. *McCleskey v. Zant*, 499 U.S. 467, 489 (1991).

### III

Campbell maintains that his current claims are properly raised in a habeas proceeding. Because the law on this subject is not clear and has been the subject of several recent, published decisions by this Circuit and the Supreme Court, we pause at the outset to clarify the standard.

### A

Although many citizens have deep-seated objections to the death penalty, execution is not per se unconstitutional. *Baze v. Rees*, 553 U.S. 35, 47 (2008). Execution necessarily involves some risk that the prisoner will, indeed, feel pain. *Id.* To some extent, this is the point: Capital punishment alone "has the potential to make the offender recognize, at last, the gravity of his crime and to allow the community as a whole . . . to affirm its own judgment that the culpability of the prisoner is so serious that the ultimate penalty must be sought and imposed." *Panetti*, 551 U.S. at 958. The Eighth Amendment interrupts the imposition of death only to ensure that the prisoner is not wantonly subjected to cruel amounts of pain, *Baze*, 553 U.S. at 47–50, and to prevent the execution of "those who are unaware of the punishment they are about to suffer and why they are to suffer it." *Panetti*, 551 U.S. at 957 (quoting *Ford v. Wainwright*, 477 U.S. 399, 422 (1986) (Powell, J., concurring)).

These two limitations represent two separate facets of the Eighth Amendment. *Ford* and *Panetti* recognized that, although execution is permissible, there is a point where a *prisoner's* ability to perceive reality is so diminished that imposing the sentence of death becomes constitutionally impermissible. Under such circumstances, the road from sanity to insanity ordinarily being a one-way street, a sentence of death—although legally pronounced—cannot legally be carried out. *Baze*, on the other hand, permits a prisoner to acknowledge the legality of his sentence while asserting an Eighth-Amendment civil-rights claim under 42 U.S.C. § 1983 to restrain the government from torturing him on his way to the next world. Because a *Baze* challenge concedes the legality of the death sentence itself, to obtain injunctive relief, a prisoner

must show:  (1) that the method of execution he currently faces is accompanied by a very high probability that he will experience severe pain, and (2) a "feasible, readily implemented" and significantly less painful alternative.  *Baze*, 553 U.S. at 52.

This substantive backdrop may be helpful to understanding the procedural labyrinth at issue in this case.  Federal law provides two methods for a prisoner to challenge his conviction or sentence:  habeas corpus and 42 U.S.C. § 1983.  *Hill v. McDonough*, 547 U.S. 573, 579 (2006).  Identifying the proper procedure for a challenge is not always an easy task.  *Id.*  However, the nature of the relief sought in every case acts as a guide.  It is undisputed that there are some post-conviction claims that cannot be brought under § 1983.  A prisoner who seeks a judgment declaring "the fact or duration" of his sentence unconstitutional *must* proceed under the habeas statutes, and *cannot* proceed under § 1983.  *Heck v. Humphrey*, 512 U.S. 477, 481 (1994).  The reason for this is simple:  a judgment in a civil tort action lacks the authority to set aside a criminal conviction or its accompanying sentence.  *See id.* at 486.

However, in *Nelson v. Campbell*, the Court suggested in dicta that some method-of-execution claims could be brought under either scheme.  541 U.S. 637, 644 (2004).  It noted hypothetically that, in a state that only permits lethal-injection executions, "a constitutional challenge seeking to permanently enjoin the use of lethal injection may amount to a challenge to the *fact* of the sentence itself."  *Id.* (emphasis added).  The Court reiterated this suggestion in *Hill*, but declined to decide the question.  Instead, the *Hill* Court narrowed *Nelson*, holding that if a method-of-execution claim concedes that some other type of execution would be constitutional, then the claim must be brought under § 1983.  *Hill*, 574 U.S. at 580–81.  Thus, after *Hill*, the only potential, yet-to-be-recognized *Nelson* claim would be a method-of-execution argument asserting that there is no constitutional means by which the prisoner could be executed.

In *Adams v. Bradshaw* (*Adams II*), we declined to read *Hill* as ending this debate.  644 F.3d 481, 482–83 (6th Cir. 2011).  In *Adams II*—prior to any factual development—the warden argued that the federal court lacked jurisdiction to review any claim in habeas if it could also have been brought under § 1983.  *Id.*  We held that this argument was far too broad, noting that some constitutional claims can indeed be brought under both regimes.  *Id.* at 483.  We also distinguished *Hill*, pointing out that Adams had not "conceded the existence of an acceptable

alternative procedure." *Id.* Because the record lacked substance, *Adams II* remanded the petition to the district court for further proceedings. *Id.* at 482. Thus, *Adams II* was simply a bare recognition that the two remedies were not mutually exclusive in every case, and that Adams was entitled to pursue factual development of his claim.

After *Adams II*, the Supreme Court decided *Glossip v. Gross*, 135 S. Ct. 2726 (2015). In *Glossip*, the Court addressed a *Baze*-style § 1983 challenge to an execution protocol. *Id.* at 2738–39. In an attempt to escape *Baze*'s requirement that they identify an alternative execution protocol (because they could not do so), the petitioners pointed to a procedural wrinkle in *Hill*, where the Court refused to read § 1983 as requiring prisoners to plead an alternative method. *Id.* The Court responded that this mischaracterized *Hill*'s holding. *Id.* Instead, the Court stated that, in *Hill*, "we held that a method-of-execution claim must be brought under § 1983 *because such a claim does not attack the validity of the prisoner's conviction or death sentence*." *Id.* (emphasis added). It then pointed out that while § 1983 might not require a plaintiff to plead an alternative method, the Eighth Amendment *does* impose such a requirement. *Id.*

*Glossip* then proceeded to untangle the appellants' (and the dissent's) attempt to eviscerate *Baze*. The majority reasoned that there was no difference between a categorical prohibition on the death penalty and a standard that permitted a *Baze* plaintiff to win relief without offering an alternative method. *Id.* at 2739. While arguing against an alternative-method requirement, the dissent suggested that "more primitive" means of execution—i.e., execution by firing squad, electric chair, or gas chamber—might also be unconstitutional. *Id.* at 2790–96 (Sotomayor, J., dissenting). But the majority responded to this with a pointed rhetorical question: "If states cannot return to any of the 'more primitive' methods used in the past and if no drug that meets with the principal dissent's approval is available for use in carrying out a death sentence, the logical conclusion is clear. But we have time and time again reaffirmed that capital punishment is not *per se* unconstitutional." *Id.* at 2739. In sum, *Glossip* held that a *Baze* challenger has no claim unless he can identify a constitutional means by which he can be executed.

**B**

Notice that this closes the final path into habeas court left open by *Hill* and *Adams II*. No one here disputes that a death-penalty challenge is not cognizable in habeas unless a defect impairs the very fact of the death sentence itself. *Glossip*, 135 S. Ct. at 2738–39; *Hill*, 547 U.S. at 579; *Nelson*, 541 U.S. at 644; *Heck*, 512 U.S. at 481; *Adams II*, 644 F.3d at 483. The reasons for this are prescribed by the statute. A § 2254 habeas court only has jurisdiction to act in favor of "a person *in custody* pursuant to the *judgment* of a State court." 28 U.S.C. § 2254(a) (emphasis added). An unconstitutional death sentence is a form of custody that the writ can reach, because it is a judgment imposed without authority. *See Irvin v. Dowd*, 366 U.S. 717, 728–29 (1961); U.S. Const., Art. VI, § 2. But as *Hill* recognized, an illegal method of execution has nothing to do with the judgment itself—unless, of course, the prisoner asserted that *all available means of execution are unconstitutional*. *Hill*, 574 U.S. at 580–81. In that case, it would effectively render the judgment void and unenforceable.

This is precisely the argument a claimant cannot make after *Glossip*. Indeed, the Court expressly refused to countenance the possibility that a state could be left without any lawful means of execution. *Glossip*, 135 S. Ct. at 2739. In the majority's view, this would be the same as an outright ban on the death penalty itself. *Id*. *Glossip* therefore closed the hypothetical door left open by *Nelson*, *Hill*, and *Adams II*. No longer can a method-of-execution claim impair a death sentence itself. And since a method-of-execution claim can no longer "attack the validity of the prisoner's conviction or death sentence," a habeas court cannot act upon it. *Id*. at 2738. Thus, the *Glossip* Court necessarily barred all habeas petitions challenging "a particular application of a particular protocol to a particular person" as unconstitutionally painful. *In re Tibbetts*, 869 F.3d 403, 406 (6th Cir. 2017). These challenges are properly remedied by an injunction prohibiting the state from *taking certain actions*, rather than a writ of habeas corpus that vacates the sentence entirely.

A review of fundamental habeas and § 1983 principles confirms that this is the correct view of the law. Only when a serious error infects the very fact of a death sentence can the writ grant relief. *See Heck*, 512 U.S. 477, 481; *Buck v. Davis*, 137 S. Ct. 759, 777 (2017). This principle arises because habeas relief does not exist to ferret out every constitutional violation, or

even to directly prohibit the government from breaking the law; instead, it exists to relieve the *prisoner* of an unlawful sentence. *See, e.g., Stone v. Powell*, 428 U.S. 465 (1976); *Gall v. Scroggy*, 603 F.3d 346, 353 (6th Cir. 2010). To that end, the writ necessarily "provides the petitioner the right to relief from *all* direct and collateral consequences of the unconstitutional [sentence]." *Gall*, 603 F.3d at 353 (emphasis added). Thus, if a petitioner's legal theory would not *inherently* require the nullification of his death sentence, he has no business proceeding in a habeas court. The Great Writ is not concerned with the piecemeal reformation of an imperfect criminal justice system.

In contrast, § 1983 is engineered to accomplish this lofty goal. The statute empowers a court to enjoin, "in equity," "the deprivation of *any* rights, privileges, or immunities secured by the Constitution and laws" of the United States. 42 U.S.C. § 1983 (emphasis added). When properly invoked, the statute can be used to compel the government to recognize that even the guilty have rights, and that even a conviction or death sentence does not deprive a person of their humanity. *See, e.g., Baze*, 553 U.S. at 52; *Hudson v. McMillian*, 503 U.S. 1 (1992); *Tennessee v. Garner*, 471 U.S. 1 (1985); *Estelle v. Gamble*, 429 U.S. 97 (1976). Indeed, Ohio death-row inmates—including Campbell—are currently litigating the constitutionality of the protocol in a § 1983 action, seeking a declaration that Ohio's execution protocol is torturously painful. *See In re Ohio Execution Protocol Litig.*, No. 2:11-cv-1016 (S.D. Ohio). In fact, Campell's motion for a preliminary injunction to stay execution is set for hearing this very week. Ultimately, this is the relief that all method-of-execution claims seek: an order directed at state officials, declaring that the state's ends do not justify its means, and requiring the state to find another, less cruel way to enforce a judgment of death against the prisoner.

## C

One wrinkle remains. After *Glossip* was decided, the *Adams* case returned to this Court. *Adams v. Bradshaw*, 826 F.3d 306 (6th Cir. 2016) (*Adams III*). *Adams III* came on appeal after our remand to the district court resulted in development of the facts. *Id.* at 309. The factual development revealed that Adams was protesting the "psychological toll" resulting from Ohio's recent changes to its lethal-injection protocol—facts not presented in *Adams II*. *Id.* at 320. We immediately responded to this revelation by holding that Adams "failed to present this claim to

the state courts, nor did he raise it in his habeas petition." *Id.* This failure, as a matter of law, barred Adams from pursuing the claim in habeas. *Id.*; 28 U.S.C. § 2254(b); *Wainwright v. Sykes*, 433 U.S. 72 (1977).

Notwithstanding the procedural default, the panel proceeded to speculate in dicta about the viability of a psychological-torment claim. *Adams III*, 826 F.3d at 320. It ultimately found the claim unsupported by the substantive law. Even then, the panel proceeded to discuss—again in dicta—the holding of *Adams II* in light of *Glossip*. *Id.* at 321. It reiterated that "Adams's case is distinguishable from *Hill* because Adams argues that lethal injection cannot be administered in a constitutional manner, and that his claim 'could render his death sentence effectively invalid.'" *Id.* at 321 (quoting *Hill*, 547 U.S. at 580). Therefore, "to the extent that [a petitioner] challenges the constitutionality of lethal injection in general and not a lethal-injection protocol, his claim is cognizable in habeas." *Id.*

We think this dictum mischaracterizes both *Adams II* and *Glossip*. And, of course, dictum in a prior decision—as opposed to a *holding*—does not bind future panels, including this one. 6th Cir. R. 32.1(b); *United States v. Turner*, 602 F.3d 778, 785–86 (6th Cir. 2010) (explaining that statements which are "not necessary to the outcome" are not binding on later panels). The *Adams III* panel had already concluded that the petitioner's claim was both procedurally defaulted *and* forfeited. *Adams III*, 826 F.3d at 320. And although we may choose to excuse forfeiture in an exceptional case, we cannot ignore procedural default absent an express finding of cause and prejudice. *Wainwright*, 433 U.S. at 86–87. Thus, the statements "necessary" to the decision in *Adams III* ended when the panel acknowledged the default and forfeiture without any indication that an exception was present. *Adams III*, 826 F.3d at 320.

Thus, to the extent that *Adams III* purported to permit *Baze*-style habeas claims that refuse to concede the possibility of an acceptable means of execution, it is not controlling. Since *Glossip*'s holding directly addressed that question, it *is* binding on us, and we follow it today. In doing so, we do not intend to diminish the importance or correctness of the holding in *Adams II* that § 1983 and habeas are not mutually exclusive *as a per se rule*. All *Baze* and *Glossip* require is that—in the peculiar context of method-of-execution claims—the death-row inmate must proceed under § 1983.

**IV**

Having clarified the standard, we examine Campbell's motion. From our reading, we discern three arguments: (1) that recent changes to Ohio's execution protocols raise new factual claims that could not have been brought in his first habeas petition; (2) that his newly worsened medical conditions render all lethal injections unconstitutionally painful; and (3) that there is no meaningful difference between mental incompetency (which precludes execution under the Eighth Amendment) and his severe physical ailments. *See Atkins v. Virginia*, 536 U.S. 304 (2002); *Ford v. Wainwright*, 477 U.S. 399 (1986). Campbell contends that since Ohio only executes prisoners by lethal injection, accepting any of these positions requires us to vacate his death sentence, as Ohio would be left with no constitutional means to execute him. We disagree.

**A**

We first address Campbell's objection to the shifting execution protocols. He notes that Ohio has repeatedly changed its lethal injection protocols since 2005, as certain drugs used in the process became increasingly difficult to acquire. He also argues that the state has experienced difficulties in implementing these protocols. He contends that he could not have raised these concerns in his first § 2254 habeas petition and that he has filed them "when the claim is first ripe." *Panetti*, 551 U.S. at 947. We have no quarrel with this statement as a practical matter—obviously Campbell is not required to predict the trajectory of Ohio's execution practices.

But that does not change the fact that, in this respect, he has not raised a *habeas* claim. If we were to hold, today, that Ohio's lethal-injection protocol has become so erratic and unpredictable that it is now "cruel and unusual in the same way that being struck by lightning is cruel and unusual," *Furman v. Georgia*, 408 U.S. 238, at 309 (1972) (Stewart, J., concurring), that order would not impair the validity of Campbell's death sentence at all. The fact that Ohio *currently* permits execution only by lethal injection does not change that fact. The Ohio legislature could, tomorrow, enact a statute reinstating the firing squad as an alternative method of execution. *See, e.g.*, Utah H.B. 11, Death Penalty Procedure Amendments, § 77-18-5.5(b)(4) (2015) ("If a court holds that execution by lethal injection is unconstitutional as applied, the method of execution for that defendant shall be by firing squad.").

In other words, our decision would not be an order setting aside Campbell's death sentence. It would be an injunction against the Ohio Department of Rehabilitation and Correction, forbidding it from killing Campbell by lethal injection. The State of Ohio could still execute Campbell—it would simply need to find a method that comports with the Eighth Amendment. Thus, while the new facts alleged by Campbell were previously unavailable, they do not create a predicate for any new *habeas* claims. His claim may be newly ripe, but Campbell is trying to pick an apple from the wrong tree.

**B**

Campbell next argues that his deteriorating physical condition makes *all methods* of lethal injection unconstitutional as to him. Because his health has significantly worsened since the filing of his original habeas petition, he maintains that these are new facts making his claim "ripe" for consideration in a "successive" habeas petition. Specifically, he contends that the pain caused by the "air hunger" inherent in a lethal injection would be magnified exponentially by his new respiratory ailments. He attempts to fit this claim into the habeas mold by asserting that this "paradoxical reaction to the administration of *any* lethal injection drug . . . render[s] any attempt of the state to execute him [given the unavailability of alternative methods] unconstitutional." Petr.'s Mot. to Remand, at 18–19. Therefore, he says, we must vacate his death sentence.

The problem is that Campbell has pled an incomplete *Baze* challenge that fails as a matter of law after *Glossip*. A prisoner who challenges a method of execution as unconstitutionally painful *must* identify an alternative means by which he may be executed. *Glossip*, 135 S. Ct. 2739. Campbell's failure to do so would require any federal court to either dismiss the claim or require him to amend his pleadings. *Id. Glossip* makes clear that a prisoner cannot invalidate his death sentence simply by asserting that *every* method offered by state statute will be unconstitutionally painful. *Id.* And as we explained above, the Court's decision to preclude this argument effectively divests us of habeas jurisdiction over such a claim.

In reaching this conclusion, we do not diminish the gravity of Campbell's allegations. We suppose that his claims, if substantiated, could raise a significant problem with administering a lethal injection. Nor do we find—as we did with the petitioner in *Tibbetts*—that Campbell

could have raised these specific allegations in 2005. *Tibbetts*, 869 F.3d at 407. We simply hold that, on these facts, Campbell has not presented any new *habeas* claims that (if meritorious) would require us to vacate his death sentence. As we noted in rejecting Campbell's first argument—even if we were to agree with Campbell on the substance here, Ohio would still be permitted to execute him. The proper method for Campbell to bring these claims is in a § 1983 action under *Baze*—as he has done in the district court. *See In re Ohio Execution Protocol Litig.* If he prevails on the merits, the district court will enjoin Ohio officials from executing Campbell by lethal injection. Again, his claim is newly ripe, but he is here attempting to seek relief in the wrong forum.

**C**

Campbell attempts to escape this problem by analogizing his claim to one challenging the competency of a prisoner to be executed. A competency claim under *Ford* is a habeas issue, and it does not become ripe until an execution date is set. *Martinez-Villareal*, 523 U.S. at 643. Since that date often may not exist during the pendency of the original habeas petition, the limitation on second-or-successive habeas petitions does not apply, so long as the second-in-time petition is filed as soon as it becomes ripe. *Panetti*, 551 U.S. at 945.

In *Tibbetts*, we rejected the argument that the *Ford* exception should extend to the petitioner's claim that he was not "well enough *physically* to face execution." 869 F.3d at 407 (italics in original). We reached this decision for two reasons. First, we noted that no authority supported the premise that physical health problems could render an execution absolutely unconstitutional in the same way insanity does. *Id.* Second, we pointed out that, at any rate, the petitioner's health allegations were either too "unspecific" to be helpful or "were known when he filed his first habeas petition." *Id.* Campbell attempts to distinguish *Tibbetts* by pleading with more specificity and arguing that the more serious versions of these ailments arose after his 2005 petition and were therefore unavailable at that time. This specificity cures the second problem identified in *Tibbetts*, but not the first. Since *Tibbetts*'s holding rested on the second problem, we did not fully articulate the reasoning behind the first problem. We clarify that position today.

For at least twenty years, medical professionals have known that mental disorders are based in biology, just as are their physical counterparts.  *See* Brian D. Shannon, *The Brain Gets Sick Too*, 24 St. Mary's L.J. 365, 367 (1993); Betsey J. Grey & Gary E. Marchant, *Biomarkers, Concussions, and the Duty of Care*, 2015 Mich. St. L. Rev. 1911 (2015).  But similarity in fact does not always equal similarity in law.  In *Tibbetts*, we recognized that deteriorating mental health impairs a person's "capacity to come to grips with his own conscience and deity." *Tibbetts*, 869 F.3d at 407 (quoting *Ford*, 477 U.S. at 409).  Thus, a biological disease lodged in the brain renders execution impermissible "only of those who are unaware of the punishment they are about to suffer and why they are to suffer it."  *Panetti*, 551 U.S. at 957 (quoting *Ford*, 477 U.S. at 422 (Powell, J., concurring)).  For this reason, a *Ford* claim is properly raised in habeas, because, if successful, it wipes out the death sentence entirely.

But the Court has not indicated that a biological disease lodged in any other part of the body has an impact on this moral calculus.  Even a terminally ill cancer patient can often contemplate what is to come.  This fact is why we said in *Tibbetts* that "we know of no comparable solicitude toward those who claim not to be well enough *physically* to face execution."  *Tibbetts*, 869 F.3d at 407.  A person's ability to reflect, repent, and grapple with his or her guilt is rarely impacted by physical sickness.  Perhaps the medical community has catalogued a physical disease so horrible, so humiliating, and so degrading that the disease itself renders execution cruel and unusual, separate and apart from the inmate's ability to engage in lucid moral reasoning.  But we are unaware of any, and Campbell has not presented one here.

## V

When placed in this context, it is clear that Campbell is seeking an injunction against a particular method of execution as applied to him, rather than an order vacating his death sentence entirely.  *See id.* at 407 n.2.  That relief is not available in a habeas action.  He has therefore not pled any new facts that, if proven, would absolutely prohibit his execution.  Neither has he brought any newly ripe legal challenges that would, if successful, require us to vacate his death sentence.  Therefore, his petition is second or successive, and we **DENY** Campbell's motion to remand the case to the district court.  Because it is second or successive, we have jurisdiction to evaluate whether § 2244(b) permits Campbell to proceed in the district court.

Although Campbell does not ask this court for authorization to file a "successive" § 2254 petition, such a request would be pointless. Campbell does not rely on a new rule of constitutional law that applies retroactively to him. While he does rely on new facts relating to Ohio's lethal injection protocols and his ongoing health problems, none of these facts concern his guilt of the underlying offenses or the legality of imposing the death sentence upon him. Therefore, he is not eligible to file a "successive" petition under § 2244(b). Consequently, as no further matters are outstanding, we **DISMISS** the petition.

———————————

**DISSENT**

———————————

KAREN NELSON MOORE, Circuit Judge, dissenting. I agree with the majority that Campbell's petition is newly ripe, but I respectfully dissent from the conclusion that he is necessarily attempting to seek relief in the wrong forum. Because I believe that he has raised sufficient newly present biological facts to render his own death sentence potentially unconstitutional and thus to render his habeas petition not "second or successive" for purposes of 28 U.S.C. § 2244(b), I would instead remand this case to the district court for further proceedings.

Campbell has, as the majority observes, detailed a host of ailments that have befallen him since 2003, when he filed his first petition. Specifically, he asserts:

> Since 2003, . . . Campbell's health has progressively, and acutely, worsened, with multiple severe and life-threatening ailments arising almost every year: 2003 – diagnosis of pulmonary hypertension; 2004 – diagnosis of increased scarring in the lungs and growing nodules in the upper lungs and severely worsening emphysema leading to concerns with air hunger; 2006 – diagnosis of Chronic Obstructive Pulmonary Disease (COPD) and emphysema classified as "end stage," diagnosis of collapsed lung and respiratory failure, sarcoidosis (for which there is not cure), coronary artery disease, atrial fibrillation, hypertension, deep vein thrombosis and pulmonary embolism; 2012 – hypoxemic respiratory failure (starving for oxygen), histoplasmosis, atrial fibrillation with rapid and out of rhythm heartbeats; 2014 – diagnosis of worsening COPD exacerbation, increasing nodules in lungs, emphysema increasing in lungs, discovery of an aortic aneurysm; 2015 – diagnosis of prostate cancer and surgical prostatectomy, spontaneous collapsed lung requiring a life flight to OSU Hospital; and a diagnosis of MRSA while at OSU Hospital; 2016 – hip replacement surgery after being knocked down by another inmate, while at OSU Hospital staff discovered a gangrenous colon and 2 surgeries were required to remove the colon and equip him with an external colostomy bag; 2017 – diagnosis of pneumonia after being hospitalized for coughing up blood. In addition to these physical characteristics that inhibit his ability to breathe, Campbell must take oxygen treatments four times a day in order to function, and he relies on a walker for very limited mobility.

Pet.'s Mot. to Remand at 17–18; *see also* R. 19-1 (Amended Pet. for Writ of Habeas Corpus at 26–27) (Page ID #522–23). As Campbell argues: "All of these conditions are sure or very likely to increase the air hunger that Campbell will necessarily suffer as the result of the State's administration of *any* lethal injection drug, and increase the sure or near certain likelihood that Campbell will suffer a paradoxical reaction to the administration of *any* lethal injection drug— thus rendering any attempt of the State to execute him [given the unavailability of alternative methods] unconstitutional." Pet.'s Mot. to Remand at 18–19.

Were Campbell simply challenging Ohio's generalized use of a particular execution protocol without offering a "known and available alternative," I agree with the majority that *Glossip v. Gross*, 135 S. Ct. 2726, 2739 (2015), would foreclose his claim. Such a ruling would be tantamount to declaring the death penalty as a whole unconstitutional in a given state, and the Court has "time and again reaffirmed that capital punishment is not *per se* unconstitutional." *Id.* I see an important distinction between *Glossip* and Campbell's case, however, in the fact that while *Glossip* featured an across-the-board challenge to the only approved methods of execution in Oklahoma, this case concerns only whether "the fact of [Campbell's] sentence itself," *Nelson v. Campbell*, 541 U.S. 637, 644 (2004), is constitutional in light of Campbell's personal biological characteristics and the currently available means of execution.

The majority correctly characterizes Campbell as seizing on this distinction by drawing an analogy between his biological ailments and the neurobiological ailments that the Court has made clear *can* undergird a successful habeas petition without running afoul of the § 2244(b) "second or successive" bar, *see Panetti v. Quarterman*, 551 U.S. 930, 945–47 (2007); *see also Stewart v. Martinez-Villareal*, 523 U.S. 637, 645 (1998). Such arguments from mental incompetency, often referred to as *Ford* claims after *Ford v. Wainwright*, 477 U.S. 399 (1986) (holding that the Eighth Amendment prohibits executing a person who is insane), clearly fall outside *Glossip*'s scope: A person who is insane when his execution date is set can still sue in habeas, and need not assert (as if he could) alternative means by which he can be killed that are somehow not at odds with the Eighth Amendment. *See, e.g., Panetti*, 551 U.S. at 945–47.

Medical science, as the majority recognizes, has meanwhile debunked the ostensible divide between mental and physical health, showing that many mental-health problems are issues

of brain biology just as pulmonary problems are issues of lung biology. *See, e.g.*, Brian D. Shannon, *The Brain Gets Sick, Too: The Case for Equal Insurance Coverage for Serious Mental Illness*, 24 St. Mary's L.J. 365, 367 (1993) (observing that "medical researchers have made numerous findings establishing that serious mental illnesses such as schizophrenia, bipolar affective disorder, and depressive illness are biologically-based diseases of the brain" (footnotes omitted)). In light of that mounting awareness, it seems "[a]n empty formality," *Panetti*, 551 U.S. at 946, to say that one petitioner's habeas claim is cognizable because his brain's biology has deteriorated substantially between the imposition and scheduled execution of a death sentence while saying that the petition of another whose biology has deteriorated in some other but equally significant way during the same span is necessarily barred. Just because such factual situations may be rare does not mean that they do not exist.[1] And in my view, Campbell has asserted sufficient biological deterioration—given the extraordinary list of ailments detailed above, *see* Pet.'s Mot. to Remand at 17–18—to justify remand for factfinding here.

I thus believe that Campbell's petition is not foreclosed by *Glossip*, and instead that he has fit his claim into the cognizable form that we outlined in *Adams v. Bradshaw*, 826 F.3d 306 (6th Cir. 2016), *cert. denied*, 137 S. Ct. 814 (2017). There, we distinguished *Hill v. McDonough*, 547 U.S. 573 (2006), which directed petitioners whose claims would "leave the State free to use an alternative lethal injection procedure" to bring suit under § 1983, *id.* at 580–81, from a case in which "lethal injection cannot be administered in a constitutional manner," and thus where the "claim 'could render [the] death sentence effectively invalid.'" *Adams*, 826 F.3d at 321 (quoting *Hill*, 547 U.S. at 580). We explained that this distinction was "consistent with the Supreme Court's reasoning in *Nelson*, which suggested that, under a statutory regime similar to Ohio's, 'a constitutional challenge seeking to permanently enjoin the use of lethal injection may amount to a challenge to the fact of the sentence itself.'" *Id.* (quoting *Nelson*, 541 U.S. at 644). As I see it, that is Campbell's argument here: because of newly developed biological facts, the state cannot constitutionally execute him by lethal injection, and because the state cannot execute him by any

---

[1]Consider, for example, a state that permits execution only by lethal injection and a defendant who after his first habeas petition develops a severe allergy to all available execution drugs, thereby guaranteeing lengthy and excruciating pain at any dose. Why wouldn't that case be more like *Ford* than *Glossip*, when it would apply uniquely to the petitioner—and thus not challenge the state's overall protocol—but still challenge the "fact of the sentence itself," *see Nelson v. Campbell*, 541 U.S. 637, 644 (2004)?

means other than lethal injection under Ohio law, his death sentence cannot now be carried out in a way that is consistent with the Eighth Amendment.

The Court in *Ford* did not specify exactly why it would violate the Eighth Amendment to kill someone who is insane at the time of execution; the Court's ultimate conclusion was simply that "[w]hether its aim be to protect the condemned from fear and pain without comfort of understanding, or to protect the dignity of society itself from the barbarity of exacting mindless vengeance, the restriction [on executing the insane] finds enforcement in the Eighth Amendment." *Ford*, 477 U.S. at 410. There are situations in which killing a person whose mental biology has deteriorated would be an exercise in mindless vengeance, and there are situations in which killing a person whose physical biology has deteriorated would be an exercise in mindless vengeance. Whether the biological facts asserted here are *ultimately* adequate to justify relief is, of course, for the district court to decide in the first instance—perhaps they are not. But because Campbell has directed us to sufficiently specific and recent biological facts that make his petition newly ripe and that could potentially make his personal death sentence unconstitutional, I would remand for further proceedings to assess whether Campbell's assertions in fact rise to that level. I therefore respectfully dissent.

ENTERED BY ORDER OF THE COURT

Deborah S. Hunt, Clerk